1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                  No.  1:11-CR-00385-DAD-BAM

12              Plaintiff,

13        v.                                     ORDER DENYING DEFENDANT'S
                                                 MOTION TO ENJOIN THE EXPENDITURE
14   RICHARD DALEMAN,                            OF FUNDS ON HIS PROSECUTION

15              Defendants.                      (Doc. No. 121)

16

17        Defendant Richard Daleman is charged with conspiracy to cultivate 1,000 or more

18   marijuana plants in violation of 21 U.S.C. §§ 841 and 846 (Count One); cultivation of 1,000 or

19   more marijuana plants in violation of 21 U.S.C. §§ 841 or aiding and abetting the same in

20   violation of 18 U.S.C. § 2 (Count Two); cultivation of more than 50 but less than 100 marijuana

21   plants in violation of 21 U.S.C. §§ 841 (Count Three); and possession of 100 more kilograms of

22   marijuana with the intent to distribute in violation of 21 U.S.C. §§ 841 or aiding and abetting the

23   same in violation of 18 U.S.C. § 2 (Count Four).  (Doc. No. 8.)[1]

24        This prosecution has a lengthy factual background which both parties have attempted to

25   summarize in their own fashion (*see* Doc Nos. 121 at 2- 15; 127 at 5-8) and which the court will

26   not repeat in its entirety here.  In short, defendant Daleman was investigated for marijuana

27   _____

28   [1]  There is also a criminal forfeiture allegation brought in the indictment pursuant to 21 U.S.C. § 853(a).

1    cultivation by Tulare County law enforcement beginning in 2008, was charged with unlawful

2    cultivation and possession of marijuana for sale in state court and was acquitted of those charges

3    following a jury trial in March 2009.  In June 2011 Tulare County law enforcement again

4    executed a search warrant at the defendant's property and seized evidence of a large marijuana

5    cultivation operation.  In August of 2011 the Tulare County Resource Management Agency

6    issued the defendant a notice of violation with respect to a county ordinance regarding the

7    cultivation of marijuana and ordered him to cease and desist.  In September 2011 defendant

8    Daleman obtained a temporary restraining order in the Tulare County Superior Court preventing

9    the county from destroying the marijuana plants located on his property.  In October of 2011 a

10   confidential source introduced undercover Detective Perez to defendant Daleman for purposes of

11   negotiating the purchase of marijuana from him.  As a result, purchases of one pound and later

12   pounds of marijuana from the defendant were consummated and the sale of 190 pounds of

13   marijuana for over $200,000 was negotiated and agreed to on October 25, 2011.  On October 31,

14   2011 law enforcement officers executed a search warrant on defendant's property resulting in the

15   seizure of over two thousand marijuana plants and hundreds of pounds of processed marijuana.  A

16   federal criminal complaint was filed the following day, November 1, 2011.  (Doc. No. 1.)  An

17   indictment was returned by the federal grand jury for this district on November 10, 2011.  (Doc.

18   No. 8.)  This federal criminal action also has a lengthy procedural history which has included the

19   denial of the defendant's motion to suppress evidence following an evidentiary hearing as well as

20   the denial of the defendant's motion to dismiss the indictment.  (Doc. Nos. 86, 104.)

21          Now before the court is defendant Daleman's motion to enjoin the U.S. Department of

22   Justice from spending funds to continue his prosecution.  (Doc. No. 121.)  At the request of the

23   defense, a supplemental evidentiary hearing[2] was held in connection with defendant's motion on

24   February 13, 2017.  At that hearing attorney Marc Days appeared on behalf of defendant Daleman

25   and Assistant U.S. Attorney Kathleen Servatius appeared on behalf of the government.

26   _____

27   [2] Ultimately, as discussed below, it was agreed by the parties that the court could consider the
     evidence, both documentary and testimonial, submitted in connection with the defendant's
28   previously ruled upon motions in ruling upon the now pending motion.

1  For the reasons set forth, defendant's motion to enjoin the expenditure of funds by the

2  U.S. Department of Justice in prosecuting this case will be denied.

3  **I.      Section 542 of the Consolidated Appropriations Act and the *McIntosh* Decision**

4      On December 18, 2015, Congress enacted an appropriations act appropriating funds

5  through the fiscal year ending September 30, 2016.[3]  Section 542 of that Consolidated

6  Appropriations Act of 2016 provides, "[n]one of the funds made available in this Act to the

7  Department of Justice may be used, with respect to any of the States . . . to prevent them from

8  implementing their own laws authorize the use, distribution, possession, or cultivation of medical

9  marijuana." Pub. L. No. 114–113, 129 Stat. 2242, 2332–33, § 542.[4]  In the motion pending

10  before the court, defendant Daleman contends the expenditure of funds to prosecute this case

11  violates this limitation on expenditures enacted by Congress and, therefore, also violates the

12  Appropriations Clause of the Constitution and must be enjoined by this court.

13      The Ninth Circuit has recently had occasion to address this very issue in *United States v.*

14  *McIntosh*, 833 F.3d 1163 (9th Cir. 2016).  In *McIntosh* the court construed the plain text of the

15  appropriations rider at issue in assessing the appellants' assertion that their criminal prosecution

16  must be enjoined and concluded

17      that § 542 prohibits the federal government only from preventing
      the implementation of those specific rules of state law that
18      authorize the use, distribution, possession, or cultivation of medical
      marijuana. DOJ does not prevent the implementation of rules
19      authorizing conduct when it prosecutes individuals who engage in
      conduct unauthorized under state medical marijuana laws.
20      *Individuals who do not strictly comply with all state-law conditions*
      *regarding the use, distribution, possession, and cultivation of*
21      *medical marijuana have engaged in conduct that is unauthorized,*
      *and prosecuting such individuals does not violate § 542.*  Congress
22      could easily have drafted § 542 to prohibit interference with laws
      that address medical marijuana or those that regulate medical
23      marijuana, but it did not.  Instead, it chose to proscribe preventing

24  _____

25  [3]  Congress has failed to enact a new appropriations act since this one and government funding
has been provided since September 30, 2016, pursuant to a continuing resolution.  However, for
26  purposes of the pending motion the government has stipulated that Section 542, the so-called
Rohrabacher-Farr amendment, currently remains in effect.

27
[4]  This provision had originally appeared as Section 538 of the Consolidated and Further
28  Continuing Appropriations Act of 2015.  Pub. L. No. 113–235, 128 Stat. 2130, § 538.

states from implementing laws that authorize the use, distribution, possession, and cultivation of medical marijuana.

\* \* \*

If DOJ wishes to continue these prosecutions, *Appellants are entitled to evidentiary hearings to determine whether their conduct was completely authorized by state law, by which we mean that they strictly complied with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana.* We leave to the district courts to determine, in the first instance and in each case, the precise remedy that would be appropriate.

We note the temporal nature of the problem with these prosecutions. The government had authority to initiate criminal proceedings, and it merely lost funds to continue them. DOJ is currently prohibited from spending funds from specific appropriations acts for prosecutions of those who complied with state law. But Congress could appropriate funds for such prosecutions tomorrow. Conversely, this temporary lack of funds could become a more permanent lack of funds if Congress continues to include the same rider in future appropriations bills. In determining the appropriate remedy for any violation of § 542, the district courts should consider the temporal nature of the lack of funds along with Appellants' rights to a speedy trial under the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. § 3161.

833 F.3d at 1179 (emphasis added). The court in *McIntosh* did not, however, explicitly address the issues of who has the burden of proving strict compliance with state law in this regard and what that burden is.

At the hearing on defendant's request for an evidentiary hearing in connection with the pending motion, held on February 6, 2017, the court determined that it is the defendant who bears the burden of proof on this issue. That determination was made based upon this court's consideration of: (1) the plain text of the appropriations rider;[5] (2) the traditional rule considering

---

[5] As the government persuasively argued, "Congress could have, but did not, explicitly place the burden on the government of demonstrating non-compliance when it enacted the appropriations riders." (Doc. No. 127 at 11) (citing *Gonzales v. O Centro Espirita Beneficente Unaio De Vegetal*, 546 U.S. 418, 424 (2006) (noting that, Congress explicitly placed the burden on the government to prove that it has a compelling interest in barring the use of peyote under the Religious Freedom Restoration Act).) In determining Congressional intent, the court is limited to the text of the appropriations rider. *See, e.g. McIntosh*, 833 F.3d at 1178 ("It is a fundamental principle of appropriations law that we may only consider the text of an appropriations rider, not expressions of intent in legislative history.") In other parts of the Consolidated Appropriations Act where Congress restricted the use of funds upon an agency, it has specifically stated when the funds can be used, what requirements must be satisfied to use the funds, and by whom. *See, e.g.*,

4

1  the allocation of the burden of proof which, "based on considerations of fairness, does not place

2  the burden upon a litigant of establishing facts particularly within the knowledge of his

3  adversary[.]" *United States v. New York, New Haven & Hartford Railroad Co.*, 355 U.S. 253, 256

4  n.5 (1957); and (3) the general rule "that the proponent of a motion bears the burden of proof."

5  *United States v. Veon*, 538 F. Supp. 237, 245–46 (E.D. Cal. 1982).

6      Finally, the court concluded that the burden borne by the defendant was to prove that he

7  was in strict compliance with California marijuana laws by a preponderance of the evidence. The

8  evidentiary hearing on this issue of compliance with state law is similar to other ancillary

9  proceedings outside the criminal trial where a preponderance of the evidence standard is

10  employed. *See, e.g.*, *Veon*, 538 F. Supp. at 248 (applying a preponderance of the evidence

11  standard for a criminal forfeiture hearing). Although the court rejected any notion that by seeking

12  to enjoin the expenditure of funds on his prosecution defendant is raising an affirmative defense

13  to the pending federal charges, this conclusion that the preponderance of the evidence standard

14  applies is consistent with the burden of proof imposed upon a defendant in presenting an

15  affirmative defense. *See United States v. Sandoval-Gonzalez,* 642 F.3d 717, 723 (9th Cir. 2011)

16  *United States v. Cruz*, 554 F.3d 840, 850 (9th Cir. 2009) ("Generally, 'the defendant must prove

17  the elements of [an] affirmative defense by a preponderance of the evidence," unless some other

18  standard is set by statute.'") (quoting *United States v. Beasley*, 346 F.3d 930, 934 (9th Cir. 2003)

19  (concluding that the defendant bears the burden of proving the affirmative defense of justification

20  by a preponderance of the evidence because it "does not involve the refutation of any of the

21  elements of [the charged offense], but requires proof of additional facts and circumstances

22  /////

23  /////

24  /////

25

26  Pub. L. No. 114–113, 129 Stat. 2242, 2332–33, § 7048 ("Of the funds appropriated by this act
that are available for a contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria

27  (Global Fund), 10 percent should be withheld from obligation *until* the Secretary of State
determines and reports to the Committees on Appropriations that the Global Fund is . . .")

28  (emphasis added). Congress has not done so in Section 542.

1   distinct from the evidence relating to the underlying offense.")[6]

2        Defendant Daleman initially argued that the question of whether DOJ was prohibited from

3   spending funds on his prosecution should be submitted to the jury and only in the alternative,

4   should be the subject of an evidentiary hearing.  (Doc. No. 121 at 2-3.)  The court rejected the

5   argument that the issue was one for a jury to decide because, for the reasons discussed above, the

6   issue of the defendant's strict compliance with state law is ancillary to and distinct from the

7   prosecution of the alleged violations of federal criminal law and is not an affirmative defense to

8   those charges.  The government argued that the evidentiary hearing previously held with respect

9   to defendant's motion to suppress evidence provided a sufficient evidentiary basis upon which to

10  resolve defendant's motion to enjoin and that "[b]ased on the testimony, reports, affidavits, and

11  exhibits, this Court has a complete record for review without the need for additional testimony."

12  (Doc. No. 127 at 10.)  The court rejected the government's argument as well, at least in part.  In

13  doing so the court relied upon the Ninth Circuit's conclusion in *McIntosh* that the appellants in

14  that case were "entitled to an evidentiary hearing to determine whether their conduct was

15  completely authorized by state law[.]" *McIntosh*, 833 F.3d at 1179.[7]  As a result of these rulings,

16  as noted above, it was agreed by the parties that in ruling upon the pending motion this court

17  would consider all relevant evidence previously submitted in connection with earlier resolved

18  pretrial motions in this prosecution as well as any additional evidence, including live testimony,

19  which the defendant wished to offer.  That hearing was held on February 13, 2017, with

20  /////

21  /////

---

22  [6]  Notably, the plain language of the rider merely places an obligation upon the Department of
23  Justice not to spend funds.  As the Ninth Circuit has made clear, this is an issue ancillary to
    federal marijuana prosecutions since the Controlled Substances Act continues to prohibit the
24  manufacture, distribution and possession of marijuana and "§ 542 does not provide immunity
    from prosecution" for those offenses.  *McIntosh*, 833 F.3d at 1179 & n. 5.  Thus, it cannot be said
25  that defendant Daleman is presenting an affirmative defense to the pending federal charges by
26  way of his motion to enjoin.

27  [7]  The Ninth Circuit's conclusion in this regard provides further support for the determination that
    defendant's motion does not present an affirmative defense to be presented to and considered by a
28  jury at trial.

1    defendant Daleman calling four witnesses to testify, including himself.[8]

2    **II.    Whether the Defendant Was in Strict Compliance with California Medical**

3    **Marijuana Laws**

4         Defendant Daleman maintains that he was in compliance with California law regulating

5    medical marijuana because he is a "qualified patient who was authorized to possess, cultivate, and

6    distribute marijuana." (Doc. No. 121 at 19.)  He contends that his marijuana operation was in

7    compliance as found by the Tulare County Sheriff's deputies (who did not arrest him after the

8    execution of the June 2011 search warrant) and the three lawyers who testified at the February 13,

9    2017 evidentiary hearing.  In this regard, defendant argues that the number of marijuana plants

10   located by law enforcement officers on his property did not exceed the number authorized by

11   valid medical marijuana recommendations. (Doc. No. 133 at 1.)  According to defendant the

12   individual plots on his farm were demarcated and identified the qualified medicinal marijuana

13   patient associated with each plot as well as the number of plants authorized by the patient's

14   recommendation. (*Id.* at 4.)  Defendant contends that he did not have an ownership interest in

15   those plots and that he simply leased them to qualified medical marijuana patients. (*Id.*)

16   Defendant also maintains that in October of 2011, when he negotiated the sale of 190 pounds of

17   marijuana to Detective Robert Perez (acting in an undercover capacity) for over $200,000, he did

18   not do so for profit because the proceeds of that transaction were to go toward costs related to his

19   farm as well as ongoing litigation fees. (Doc. No. 121 at 20–21.)  Moreover, he attempts to

20   justify the recorded transaction on the grounds that he believed the undercover officer was both a

21   qualified patient and acting on behalf of a medical marijuana dispensary in Los Angeles. (Doc.

22

23   [8]  Those witnesses included attorneys Andy Rubinger, William Roger McPike and John Patrick
     Ryan.  Mr. Rubinger was the public defender who represented defendant Daleman at his 2009
24   trial in the Tulare County Superior Court which resulted in his acquittal.  Mr. McPike was an
     attorney hired by defendant to consult with him regarding California law regulating medical
25   marijuana.  Mr. Ryan was the attorney who represented defendant in connection with the cease
     and desist order issued by Tulare County in 2011 and the subsequent proceedings in the Tulare
26   County Superior Court where he successfully obtained a temporary restraining order.  While all
     three attorneys had visited defendant Daleman's property where marijuana was grown, their
27   testimony was quite general in nature and not particularly relevant to resolution of the specific
     issues raised by the pending motion.
28

1   No. 121 at 20–21.)

2       The government argues that defendant Daleman was clearly not operating in strict

3   compliance with state law in any number of respects.  First, the government contends defendant

4   Daleman possessed more marijuana than was authorized.  (Doc. No. 127 at 14.)  In addition, the

5   government maintains that the defendant's interaction with Detective Perez were not in

6   compliance with state law because the defendant cannot claim caregiver protection with respect to

7   anyone and because Detective Perez was not a member of the collective.  (*Id.* at 15, 19.)

8       The sale and possession for sale of marijuana is unlawful under California law and this

9   remains the case for purposes of the pending motion.  See Cal. Health & Safety Code §§ 11359,

10  11360; *see also People v. Trippet*, 56 Cal. App. 4th 1532, 1546 (1997); *People  ex re. Lungren v.*

11  *Peron*, 59 Cal. App. 4th 1383, 1389 (1997).  Nonetheless, this court must consider the evidence

12  and the parties' arguments in light of California's Compassionate Use Act ("CUA") and the

13  Medical Marijuana Program Act ("MMPA").  California's CUA, passed as Proposition 215 in

14  1996, provides immunity from prosecution for violating state law to "a patient, or to a patient's

15  primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the

16  patient upon the written or oral recommendation or approval of a physician."  Cal. Health &

17  Safety Code § 11362.5(b)(1)(C).  In 2003, the California Legislature enacted the MMPA to

18  clarify the scope of the CUA.  "In addition to establishing the identification card program, the

19  MMP[A] also defines certain terms, sets possession guidelines for cardholders, and recognizes a

20  qualified right to collective and cooperative cultivation of medical marijuana."  California

21  Attorney General's Guidelines for the Security and Non-Diversion of Marijuana Grown for

22  Medical Use (Aug. 2008) at 2, available at http://ag.ca.gov/cms_attachments/press/

23  pdfs/n1601_medicalmarijuanaguidelines.pdf (hereinafter, "the Guidelines") (citing Cal. Health &

24  Safety Code §§ 11362.7, 11362.77, 11362.775).[9]

25  /////

26  /////

27  ─────────────────────

28  [9]  California Health & Safety Code § 11362.81(d) required the California Attorney General to establish guidelines clarifying the scope of the MMPA.

8

The Guidelines note,

> "California law does not define collectives, but the dictionary defines them as 'a business, farm, etc., jointly owned and operated by the members of a group.' (*Random House Unabridged Dictionary*; Random House, Inc. © 2006.) Applying this definition, a collective should be an organization that merely facilitates the collaborative efforts of patient and caregiver members – including the allocation of costs and revenues. As such, a collective is not a statutory entity, but as a practical matter it might have to organize as some form of business to carry out its activities. *The collective should not purchase marijuana from, or sell to, non-members; instead, it should only provide a means for facilitating or coordinating transactions between members.*"

*Id.* at 8 (emphasis added).

The Guidelines also provide suggested practices for "operating collective growing operations to help ensure lawful operations." *Id.* at 9. Notably, the Guidelines provide that cooperative or collectives must be non-profit operations as "nothing in Proposition 215 or the MMP[A] authorizes collectives, cooperatives, or individuals to profit from the sale or distribution of marijuana." *Id.* (citing § 11362.765(a)). However, a letter from the California Attorney General's office dated December 21, 2011 notes that the term "profit" remains undefined in so far as "determining what costs are reasonable for a collective or cooperative to incur. This is linked to the issue of what compensation paid by a collective or cooperative to members who perform work for the enterprise is reasonable." (Doc. No. 133-2 at 4.) In addition, the Guidelines provide that members should acquire, possess, and distribute marijuana among members of the collective only such that "the cycle should be a closed-circuit of marijuana cultivation and consumption with no purchases or sales to or from non-members." Guidelines at 10. Members can also reimburse the collective or cooperative for marijuana allocated to them only as long as "any monetary reimbursement that members provide to the collective or cooperative should only be an amount necessary to cover overhead costs and operating expenses." *Id.* The guidelines also recommend procedures for verifying the member's status as a qualified medical marijuana patient or primary caregiver:

> Unless he or she has a valid state medical marijuana identification card, this should involve personal contact with the recommending physician (or his or her agent), verification of the physician's

1  | identity, as well as, his or her state licensing status.  Verification of
2  | primary caregiver status should include contact with the qualified
   | patient, as well as validation of the patient's recommendation.
3  | Copies should be made of the physician's recommendation or
   | identification card, if any[.]"

4  *Id.* at 9.

5          Given the evidence before it, this court need not determine whether the number of

6  marijuana plants found on defendant Daleman's property during the searches in 2011 exceeded

7  the number authorized by valid medical marijuana recommendations.[10]  Nonetheless, the court

8  does note that defendant's testimony both before and at the February 13, 2017 hearing regarding

9  the specifics of how he was operating is, at the very least, confusing.  He testified at the earlier

10 suppression hearing that he did not hold himself out as operating a collective at his property but

11 that he instead belonged to a collective or collectives operating at locations other than his farm.

12 (Doc. No. 56 at 23–24.)  At that same hearing he testified as follows: "I wasn't in the business of

13 growing marijuana for my own personal use, and I was in the business of renting land out.  I was

14 put in the business of selling marijuana to go do litigation against the County."  (*Id*. at 28.)

15 Nonetheless, even if defendant Daleman had been effectively operating a collective, the court

16 finds that his negotiated sale of marijuana to undercover Detective Perez is a more than sufficient

17 basis upon which to conclude that he was not operating in strict compliance with state law.

18         Defendant's first interaction with Detective Perez occurred on October 21, 2011.  (Doc.

19 No. 127 at 6.)  The parties dispute whether Detective Perez represented himself to the defendant

20 /////

21 /////

22 _____

23 [10]  According to defendant, he was growing 90 marijuana plants as authorized by his own medical
marijuana recommendation.  (Doc. No. 133 at 1.)  He argues that "[i]n addition, recommendations
at the farm did not exceed the number authorized.  Recommendations authorized 3,021 plants and
there were 2,420 plants when considering 257 plants claimed by the government were starter
24 plants with no roots."  (*Id.* at 1–2.)  The government, however, maintains that defendant was
growing 150 plants for his personal use, exceeding the authorized number for that purpose.  (Doc.
25 No. 127 at 5.)  The defendant's wife also had her own medical marijuana recommendation
authorizing 90 plants, but when officers executed their search of the property she indicated that
26 her plants were outside where the officers instead found 257 plants.  (*Id.*)  Ultimately, according
to the government, "[t]he recommendations authorized a total of 2,161 marijuana plants but 2,677
27 were counted in that field."  (*Id.*)

28

1    as a qualified patient from a medical marijuana dispensary in Los Angeles.[11]  While defendant

2    maintains that he was quickly shown paperwork by someone suggesting that Detective Perez

3    represented "a smoke shop" or that his uncle owned a medical marijuana dispensary in Los

4    Angeles, defendant has conceded that he did not make a copy of that paperwork.  (*See* Doc. No.

5    56 at 19.)  At their first meeting, Detective Perez purchased one pound of marijuana from the

6    defendant for $1220 and indicated a desire to purchase a large amount of marijuana to ship out of

7    state.  (Doc. No. 127 at 6.)  Defendant stated that he could provide more than 150 pounds.  (*Id.*)

8    On October 25, 2011, at a meeting that was surreptitiously recorded by law enforcement,

9    defendant Daleman advised Detective Perez that an individual from Santa Cruz had arrived with

10   over 160 pounds of marijuana and was waiting in a motel in Tulare.  Defendant Daleman further

11   represented that he had another 24 pounds and that he could obtain an additional 40 pounds of

12   marijuana.  (Doc. No. 127-1 at 70.)  Defendant Daleman ultimately arranged to sell 190 pounds

13   of marijuana to Detective Perez for over $200,000 to be picked up the following Monday.  (Doc.

14   Nos. 127 at 7; 127-1 at 71, 81-82, 84.)  Detective Perez specifically advised defendant Daleman

15   that they were "taking it [the marijuana] back east," not to a Los Angeles dispensary.  (Doc. No.

16   127-1 at 74.)  Detective Perez and another undercover agent then purchased an additional two

17   pounds of marijuana from defendant Daleman at $1220 per pound.  (Doc. Nos. 127 at 7; 127-1 at

18   73.)  Finally, defendant has testified that he intended to use the money he believed he would make

19   from this transaction to pay his litigation related fees and expenses, which he estimated to be

20   approximately $250,000.  (Doc. Nos. 56 at 20; 121 at 21; 127 at 6.)

21        The evidence of defendant Daleman's interaction with Detective Perez appears to this

22   court to be compelling evidence of the unlawful sale of marijuana in violation of California law

23

24   [11]  Defendant continues to maintain that he *believed* detective Perez was both a qualified patient
     and dispensary operator out of Los Angles.  (Doc. No. 121 at 20.)  The government contends,
25   "[t]he source did not introduce the detective as the owner or operator of a dispensary, the
     detective did not make such a claim, nor did the detective ever indicate he possessed a
26   recommendation for the use or cultivation of medical marijuana."  (Doc. No. 127 at 6.)  The
     original conversation during which defendant was introduced to Detective Perez was recorded by
27   law enforcement, but it was reportedly discovered that the recording had been lost after the
     defendant requested a copy of it in discovery.  (Doc. No. 121 at 20.)
28
                                               11

1   and certainly not of a transaction authorized by California's medical marijuana laws.  Under those

2   laws, certain transactions among members of a collective are protected.  However, here,

3   defendant's sales of marijuana to Detective Perez did not include any member of a collective with

4   which he was associated.  Defendant has presented no persuasive evidence that the individual

5   from Santa Cruz who he alleges donated 160 pounds of the marijuana to be sold was a member of

6   defendant's, or any other, collective.  Likewise, defendant has offered no persuasive evidence that

7   Detective Perez and the other undercover agent who accompanied him were members of a

8   collective.  He has failed to offer a copy of Perez's physician's recommendation or identification

9   card (*see* Guidelines at 9), offering the explanation that he did not have a cord for his copy

10  machine at the time.  Even if an expansive view of a "collective" is adopted wherein, "large-scale

11  cultivation and transportation of marijuana, memberships in multiple collectives, and the sale of

12  marijuana through dispensaries" (Doc. No. 133-2 at 3) is permitted, defendant Daleman has failed

13  to present any persuasive evidence that Detective Perez was representing a legitimate medical

14  marijuana dispensary in Los Angles or that he was a qualified patient.  Rather, the evidence

15  before the court establishes that Detective Perez and the other undercover agent represented to

16  defendant that they intended to take the marijuana they were buying from him "back east" to

17  distribute it and not to an authorized dispensary in Los Angeles.  Finally, under California law for

18  medical marijuana transactions to be authorized, "the cycle should be a closed-circuit of

19  marijuana cultivation and consumption with no purchases or sales to or from non-members."

20  Guidelines at 10; *see also People v. Hochanadel*, 176 Cal. App. 4th 997, 1018 (2009); *County of*

21  *Los Angeles v. Hill*, 192 Cal. App. 4th 861, 869-70 (2011).  Defendant Daleman's transaction

22  with undercover Detective Perez clearly does not comply with that requirement.[12]

23          The Ninth Circuit has emphasized that in order to find that the Rohrabacher-Farr

24  amendment prohibits DOJ's expenditure of funds in connection with a federal marijuana

25  _____

26  [12]  In addition, the evidence establishes that defendant was in possession of hundreds of pounds of
     marijuana at the time of the 2011 searches.  Yet, he has presented no evidence that this amount of

27  marijuana was possessed for his own medical needs.  Nor has he presented any evidence that he
     was the primary caregiver for anyone, so as to in some way bring his distribution of marijuana

28  under the protection afforded by California law.  *See People v. Mentch*, 45 Cal. 4th 274 (2008)

                                                    12

1  prosecution, a defendant must establish at an evidentiary hearing that he or she "*strictly* complied

2  with all relevant conditions imposed by state law on the use, distribution, possession, and

3  cultivation of medical marijuana."  *McIntosh*, 833 F.3d at 1179 (emphasis added).  Defendant

4  Daleman has failed to make that required showing by a preponderance of the evidence.

5                                        CONCLUSION

6         Accordingly and for all of the reasons set forth above, the court denies defendant

7  Daleman's motion to enjoin the expenditure of funds on his federal prosecution.  (Doc. No. 121.)

8  The jury trial in this action remains scheduled for February 28, 2017, absent further order of the

9  court.[13]

10 IT IS SO ORDERED.

11    Dated:   __**February 17, 2017**__                    _____

12                                        UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

---

[13]  Defendant's counsel has indicated that if the motion to enjoin is denied, defendant wishes to pursue an interlocutory appeal of that order.  Ordinarily, orders addressing pretrial motions in criminal cases are not subject to interlocutory appeal.  *See United States v. Lewis*, 368 F.3d 1102, 1104 (9th Cir. 2004); *see also United States v. Austin*, 416 F.3d at 1016, 1020 (9th Cir. 2005).  However, under the "collateral order doctrine" exception orders meeting certain requirements are subject to interlocutory review.  *Lewis*, 368 F.3d at 1104-06; *see also Austin*, 416 F.3d at 1021-24.  Those requirements may, arguably, be present here.  Moreover, the court notes that the *McIntosh* decision itself was rendered in response to consolidated interlocutory appeals and petitions for writs of mandamus from pretrial orders issued by district courts.  *McIntosh*, 833 F.3d at 1168.  Accordingly, if defendant elects to pursue an interlocutory appeal from this order and wishes to seek a stay of the scheduled jury trial and there is no stipulation reached between the parties with respect to that request, his counsel is directed to do so by way of application for order shortening time so that the motion for a stay may be addressed prior to the currently scheduled trial date.